Christopher A. Seeger
Jeffrey S. Grand.
Christopher L. Ayers
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, New Jersey 07660
(973) 639-9100

*Attorneys for Plaintiff and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| REBECCA VEGA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>L'OREAL USA, INC.,<br><br>Defendant. | Civil Action No.<br><br><br><br>**COMPLAINT and DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS

JURISDICTION AND VENUE ........................................................................1

PARTIES        ...........................................................................................1

STATEMENT OF THE CASE........................................................................1

     I.      THE COSMETICS INDUSTRY ..................................................3

          A.      Cosmetics are a Multi-Billion Dollar Industry that
is Largely Unregulated...................................................3

          B.      Consumers Value Safe and Healthy Cosmetic Products .................4

     II.     PFAS ARE TOXIC AND POSE SUBSTANTIAL HEALTH
RISKS TO HUMANS AND THE ENVIRONMENT.................................6

     III.    THE USE OF PFAS IN COSMETIC PRODUCTS .................................13

     IV.    INDEPENDENT LAB TESTING CONFIRMS PRESENCE
OF PFAS IN CERTAIN L'OREAL COSMETIC PRODUCTS ...............17

     V.     L'OREAL'S MISLEADING ADVERTISING OF ITS
WATERPROOF MASCARA PRODUCTS...........................................18

     VI.    PLAINTIFF'S USE OF L'OREAL'S WATERPROOF
MASCARA PRODUCTS......................................................25

     VII.   DEFENDANT'S PACKAGING CLAIMS MISLED AND
DECEIVED CONSUMERS ...................................................27

     VIII.  CONSUMER RELIANCE WAS REASONABLE
AND FORESEEABLE ........................................................28

     IX.    DEFENDANT'S KNOWLEDGE OF THE
MISREPRESENTATIONS AND OMISSIONS ......................................29

     X.     DEFENDANT ACTED NEGLIGENTLY AND/OR
INTENTIONALLY TO MISLEAD CONSUMERS...............................29

     XI.    TOLLING OF STATUTES OF LIMITATIONS .....................................30

CLASS ACTION ALLEGATIONS .................................................31

CAUSES OF ACTION .......................................................34

FIRST CAUSE OF ACTION .................................................34

SECOND CAUSE OF ACTION ..............................................37

THIRD CAUSE OF ACTION .................................................39

FOURTH CAUSE OF ACTION ........................................................................................41

FIFTH CAUSE OF ACTION ...........................................................................................42

PRAYER FOR RELIEF ...................................................................................................45

Plaintiff Rebecca Vega, on behalf of herself and all others similarly situated, files this class action complaint against Defendant L'Oreal USA, Inc.  Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on personal knowledge.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because this civil action is a class action in which the matter in controversy exceeds $5,000,000 exclusive of interest and costs, and members of the putative class are citizens of a state that is different than the state of which Defendant is a citizen.

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's and the Class Members' claims occurred in this District, and Defendant is subject to the Court's personal jurisdiction.

## PARTIES

3.      Plaintiff Rebecca Vega resides in Belleville, New Jersey, as she did at all relevant times during the conduct alleged in this Complaint.

4.      Defendant L'Oreal USA, Inc. is a Delaware corporation with a principal place of business in New York, New York. At all times relevant to this Complaint, L'Oreal USA, Inc. has transacted business in this judicial district and throughout the United States, including in New Jersey.

## STATEMENT OF THE CASE

5.      L'Oreal USA, Inc., one of the largest cosmetics companies in the world, intentionally fails to disclose to consumers that its popular waterproof mascara products contain Per and Polyfluoroalkyl Substances, or "PFAS," despite the fact that L'Oreal knew or should have

known that this information is material to consumers.

6.      Instead, L'Oreal represented that its waterproof mascaras were safe, effective, high quality, and appropriate for use on consumers' eyelashes.

7.      However, what L'Oreal did not tell consumers is that PFAS, which can have adverse effects on humans and can bioaccumulate in human's bodies, are present in detectable amounts in its waterproof mascaras. Even very low levels of PFAS can be toxic to humans.

8.      This is true even where PFAS are not ingested but rather are applied to skin because PFAS can be absorbed through the skin. This risk is particularly high where the PFAS are applied near the eyes, as is the case with mascara products.

9.      This is true even where PFAS are not ingested but rather are applied to skin because PFAS can be absorbed through the skin. This risk is particularly high where the PFAS are applied near the eyes, as is the case with mascara products.

10.     This is true even where PFAS are not ingested but rather are applied to skin because PFAS can be absorbed through the skin. This risk is particularly high where the PFAS are applied near the eyes, as is the case with mascara products.

11.     From at least 2018 through the present, Defendant's waterproof mascara was misleadingly and fraudulently advertised because it failed to disclose the presence of PFAS in L'Oreal's waterproof mascara products. This failure to warn injured reasonable consumers, including Plaintiff, who reasonably relied upon Defendant's misleading packaging and ingredient list that did not disclose that the waterproof mascara products contained harmful PFAS. Had Plaintiff and the putative Class known that L'Oreal's waterproof mascara products contained PFAS, they would not have purchased the products and/or would have paid less for them.

## I.   THE COSMETICS INDUSTRY

### A.   Cosmetics are a Multi-Billion Dollar Industry that is Largely Unregulated

12.     Personal care products are a multi-billion-dollar industry in the United States. In 2019 alone, the retail value of personal care products was estimated to be greater than $100 billion in North America, approximately $20 billion of which came from cosmetic products.

13.     In the United States, women spend, on average, $313 per month on beauty products, including cosmetics, and that number is only growing.[1] The most popular products are eye products, particularly mascaras, and lip products.

14.     The cosmetics industry is dominated by large, multinational companies with significant brand recognition and correspondingly significant sales, including L'Oreal USA, Inc. (which owns both L'Oreal and Maybelline branded products), Coty (which owns the CoverGirl brand), and Revlon.[2]

15.     A recent study from 2021 found that U.S. consumers were both most aware of, and had actually purchased products within the last year from, the CoverGirl, Maybelline, L'Oreal and Revlon brands.[3]

16.     The use and labeling of cosmetic products ingredients in the United States is regulated by the Federal Food, Drug, and Cosmetics Act of 1938 and the Fair Packaging and Labeling Act of 1967. Cosmetic products are those that are "intended to be rubbed, poured, sprinkled, sprayed on, introduced into, or otherwise applied to the human body . . . for cleansing, beautifying, promoting attractiveness, or altering the appearance." FD&C Act, sec. 201(i).

---

[1] https://www.byrdie.com/average-cost-of-beauty-maintenance

[2] https://www.statista.com/topics/1008/cosmetics-industry/

[3] *Id*.

17.     However, with the exception of some color additives, the FDA does not require cosmetic ingredients or cosmetics products to have FDA approval prior to entering the market, and federal regulations also do not regulate the type or kind of testing that is needed to determine the safety of cosmetic ingredients or products.[4]

18.     The only oversight that exists is entirely voluntary on the part of cosmetics companies. The Voluntary Cosmetic Reporting Program is a "voluntary registration system for cosmetic products" where companies can register the brand name and ingredients of their products.

19.     The identification of cosmetic product ingredients in the United States generally follow conventions set forth by the International Nomenclature of Cosmetic Ingredients (ICNI), which established standards for naming cosmetic ingredients. The ICNI list is maintained by the Personal Care Products Council, an industry trade group comprised of over 600 member companies.

20.     The Personal Care Products Council also funds the Cosmetic Ingredient Review, which purportedly assesses the safety of cosmetic ingredients. But, again, participation is entirely voluntary, meaning that, in general, the cosmetics industry is subject to essentially no oversight and consumers are left to simply trust the manufacturers of cosmetics products that the products are safe for use.

**B.      Consumers Value Safe and Healthy Cosmetic Products**

21.     The global market for natural cosmetics and personal care products has increased substantially over the past three years, increasing from almost 34.5 billion dollars in 2018 to roughly 54.5 billion dollars expected in the year 2027.[5]

---

[4] https://www.fda.gov/cosmetics/voluntary-cosmetic-registration-program

[5] https://www.statista.com/statistics/673641/global-market-value-for-natural-cosmetics/

22.     This growth has been driven by increased consumer demand for natural ingredients and "green" products in general.[6]   One study found that approximately 70% of U.S. consumers ages 18-29 would prefer to use natural or organic cosmetics.[7]

23.     The growth has also been driven by legitimate concerns that consumers have about the contents of the products they use on their skin and body. For example, consumers have pursued high-profile lawsuits like the one against Johnson & Johnson related to its baby powder causing ovarian cancer (*see, e.g.*, *Ingham v. Johnson & Johnson*, 608 S.W.3d 663, 724 (Mo. Ct. App. 2020), *reh'g and/or transfer denied* (July 28, 2020), *transfer denied* (Nov. 3, 2020), *cert. denied*, No. 20-1223, 2021 WL 2194948 (U.S. June 1, 2021)) or the class action case against Wen hair care company alleging that its products made people's hair fall out (*see, e.g.*, *Collazo v. Wen by Chaz Dean, Inc.*, No. 215CV01974ODWAGR, 2015 WL 4398559, at *1 (C.D. Cal. July 17, 2015)). These types of high-profile lawsuits have made consumers afraid of chemicals and more interested in products that are "natural" and "safe."[8]

24.     In response, many companies are replacing synthetic chemicals with natural ingredients.

25.     For example, popular beauty retailer Sephora has created an internal "seal of approval" to designate "clean" beauty brands. As of July 2021, one of Sephora's requirements for that designation is that the product does not contain PFAS.[9]   Sephora's website lists 374 cosmetics

---

[6] https://www.futuremarketinsights.com/reports/organic-cosmetics-market

[7] https://disturbmenot.co/beauty-industry-statistics/

[8] https://www.vox.com/the-goods/2018/9/18/17866150/natural-clean-beauty-products-feinstein-cosmetics-bill-fda

[9] https://www.sephora.com/beauty/clean-beauty-products

products, including mascara and lip products, that have attained its "clean" designation.[10]

26.    Ulta Beauty, another large cosmetics retailer, also maintains a "clean ingredients" list of cosmetics made without certain harmful ingredients, including PFAS.[11]

27.    Similarly, this increased demand has spurred the expansion of retailers dedicated to "clean" beauty, including Credo, which launched in 2015 and currently has ten brick and mortar retail locations in the U.S. and sells 418 separate cosmetics products on its website, all of which it contends are free of any of the 2,700 ingredients on its "Dirty List," including PFAS.[12]

28.    Even retailers like Target and CVS have dedicated additional shelf-space to natural beauty offerings.[13]

29.    Retailer willingness to incorporate and promote "clean" beauty products is due in part to consumers' willingness to pay more for these products that they perceive as a safer and healthier alternative to traditional brands. For example, a popular brand called Benefit, which is not "clean," sells a highly-rated foundation for $30, whereas Tarte, another popular brand, sells a highly-rated "clean" foundation for $39.[14]

## II.   PFAS ARE TOXIC AND POSE SUBSTANTIAL HEALTH RISKS TO HUMANS AND THE ENVIRONMENT

30.    PFAS are human-made, synthetic chemicals that do not exist naturally in the environment. They have been used for decades in industrial processes and to produce consumer,

---

[10] https://www.sephora.com/shop/clean-makeup

[11] https://www.ulta.com/conscious-beauty/clean-ingredients/

[12] https://cdn.shopify.com/s/files/1/0637/6147/files/The_Dirty_List_PDF_August_Update.pdf?v=1598294504

[13] https://www.vox.com/the-goods/2018/9/18/17866150/natural-clean-beauty-products-feinstein-cosmetics-bill-fda

[14] https://www.huffpost.com/entry/why-clean-beauty-is-more-expensive_l_5fdb7307c5b6f24ae35e39d8

household, and commercial products.

31.     Consumer products manufactured with PFAS were often promoted as being resistant to heat and stains, long-lasting, and capable of repelling water, oil, and grease. Companies have utilized PFAS to make, among other things, carpets, clothing, fabrics for furniture, paper packaging for food, and other materials such as cookware that are resistant to water, grease, or stains.

32.     Although there are thousands of unique PFAS in existence, the details of many of these compounds are proprietary and known only to manufacturers and industrial users. But, what all PFAS share is that they contain multiple carbon-fluorine bonds, considered one of the strongest in chemistry, making them highly persistent in the environment and in human and animal bodies. In addition, the shared, characteristic chemistry common to all PFAS confers on each of these compounds hydrophobic and oleophobic properties, making PFAS effective surface protectors.

33.     PFAS are extremely soluble in water, which has led to their discovery in groundwater, rivers, and the ocean, as well as drinking water resources, fish, and marine mammals.

34.     PFAS can be categorized as either "long-chain" or "short-chain" based on the number of carbon atoms they contain. Long-chain PFAS contain 7 or more carbon atoms, while PFAS containing fewer than 7 carbon atoms are considered short-chain.

35.     Long-chain PFAS, such as perfluorooctanoic acid (PFOA) and perfluorooctane sulfonate (PFOS), have been widely detected in environmental samples, wildlife, and humans across the globe. Long-chain PFAS bioaccumulate and bio-magnify in both humans and in wildlife.

36.     In the Stockholm Convention on Persistent Organic Pollutants, PFOS is listed in Annex B. Annex B consists of persistent organic pollutants whose production, use, import, and

export the Convention aims to restrict.

37.     The European Union specifically regulates products containing PFAS, restricting the manufacture or import of products containing more than 25 parts per billion (ppb) of PFOA.

38.     In October 2021, the US government announced its "PFAS Strategic Roadmap," which is an interagency plan to combat the continued use and release of PFAS. As part of the Strategic Roadmap, the Environmental Protection Agency (EPA) committed to designating PFOA and PFOS as "hazardous substances" under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA); finalizing a PFAS reporting rule under the Toxic Substances Control Act (TSCA) section 8(e); and publishing toxicity assessments for 7 widely used PFAS, including the short-chain compound GenX, PFBA, PFHxA, PFHxS, PFNA, and PFDA.

39.     Following announcement of the Strategic Roadmap, a majority of the EPA's Science Advisory Board (SAB) agreed with the EPA that PFOA is a "likely carcinogen," with some members supporting a designation of "carcinogen." For PFOS, the SAB indicated that the evidence supports a label of "likely carcinogen."

40.     Short-chain PFAS unfortunately pose health and safety risks that are similar to their long-chain counterparts.

41.     Short-chain PFAS consist of multiple carbon-fluorine bonds, which, like long-chain PFAS, makes them highly persistent in the environment. They also bioaccumulate in human and animal bodies.

42.     A 2019 study conducted by the U.S. Department of Health and Human Services' National Toxicology Program found that short-chain PFAS have the same adverse effects as long-chain compounds. This study determined that both long and short-chain PFAS compounds affect

the same organ systems, with the greatest impact observed in the liver and thyroid hormone.[15]

43.     Humans may be exposed to PFAS through a variety of pathways, including ingestion, inhalation, and skin absorption. Studies dating back at least a decade have indicated that PFAS can be absorbed through skin, with evidence showing that PFAS in the blood increase after application to skin.

44.     Many PFAS, both long and short chain, are toxic to humans at extremely low levels. Exposure to certain PFAS is associated in the medical and scientific literature with harmful and serious health effects in humans and animals, including but not limited to: (a) altered growth; (b) impacts to learning and behavior of infants and older children; (c) lowering a woman's chance of getting pregnant; (d) interference with the body's natural hormones; (e) increased cholesterol levels; (f) modulation of the immune system; (g) testicular and kidney cancers; (h) thyroid disease; (i) high uric acid levels; (j) elevated liver enzymes; (k) ulcerative colitis; and (l) pregnancy-induced hypertension.

45.     The International Agency for Research on Cancer (IARC) has classified PFOA as possibly carcinogenic to humans.[16]

46.     There is also evidence in the scientific literature that PFAS exposure is positively correlated with certain metabolic diseases, such as diabetes, overweight, obesity, and heart disease.

47.     The Center for Disease Control's Agency for Toxic Substances and Disease Registry has recognized that exposure to PFAS may impact the immune system and reduce antibody response to vaccines. This is especially significant given the current public health risks

---

[15] https://ntp.niehs.nih.gov/whatwestudy/topics/pfas/index.html

[16] https://monographs.iarc.who.int/wp-content/uploads/2018/06/mono110-01.pdf?source=post_page

posed by COVID-19 and efforts to protect against the virus with vaccines.

48.     PFAS is capable of crossing the placenta, meaning pregnant women transfer PFAS to their unborn children. Women exposed to PFAS during pregnancy have higher risks of gestational diabetes and pre-eclampsia, and their babies are more likely to undergo abnormal growth in utero, leading to low birth weight, and later face an increased risk of childhood obesity and infections.

49.     Researchers have begun to find significant increases of certain short-chain PFAS in the blood of sample populations, raising concerns that short-chain PFAS are assuming the body burden once exclusively occupied by long-chain compounds.

50.     Consumers are rightfully concerned about the presence or risk of PFAS in various products.

51.     However, PFAS are essentially unregulated at the federal level. For example, the Safe Drinking Water Act (SDWA) protects public water supplies across the U.S. and is enforced by the Environmental Protection Agency (EPA). Under this law, the EPA has not (although it could) formally created a Maximum Contaminant Level for PFAS in the water supply. Rather, the EPA has issued a health advisory for PFOA and PFOS that serve as "informal technical guidance" to assist government officials and water system managers in sampling and treating PFOA and PFOS in drinking water.[17]

52.     Over the past decade, several states have enacted maximum contaminant levels regulating certain PFAS, including PFOA and PFOS, in drinking water.

53.     The State of New Jersey was one of the first to recognize that PFAS were harmful

---

[17] https://www.epa.gov/pfas/pfas-laws-and-regulations

to humans and should be regulated. In 2007, years before other states took any action, New Jersey's Department of Environmental Protection issued a preliminary drinking water guidance for PFOA. The state lowered this standard in 2017 and, in June 2020, finalized a rule setting the state's maximum contaminant level for PFOA at 14 parts per trillion.[18]

54.     In 2016, New York State took steps to regulate when and how PFAS could knowingly be released into the environment, for example for firefighting purposes.[19]  Then, in 2020, New York enacted a law prohibiting the sale of food packaging containing PFAS, effective Dec. 31, 2022.[20]

55.     In October 2020, California passed a law titled the Toxic Free Cosmetics Act, Assembly Bill 2762, that, starting January 1, 2025, will prohibit the manufacturing or selling of any cosmetic product with any intentionally added amount of 24 specified chemicals, including PFAS.

56.     In March 2021, California's Office of Environmental Health Hazard Assessment (OEHHA) released a Notice of Intent to list PFOA as a carcinogen under Proposition 65. In December 2021, the OEHHA approved the listing of PFOS as a carcinogen under Proposition 65.

57.     California recently passed legislation banning the use of PFAS in paper-based food packaging as well as the disclosure of the presence of PFAS in cookware.[21]  This bill, Assembly

---

[18] https://www.nj.gov/dep/srp/emerging-contaminants/#:~:text=In%20October%202017%2C%20the%20NJDEP,(10%20ng%2FL).

[19] https://www.dec.ny.gov/chemical/108831.html

[20] https://www.natlawreview.com/article/new-york-bans-pfas-food-packaging#:~:text=New%20York%20State%20Governor%20Andrew,%2C%20effective%20December%2031%2C%202022

[21] https://www.nrdc.org/experts/avinash-kar/ca-bill-reduce-toxic-pfas-exposures-passed-legislature

Bill 1200, builds off similar food-packaging legislation passed in 2020 in New York.[22]

58.     Similarly, in July of 2021, the State of Connecticut signed a bill into law banning the use of firefighting foam and food packaging that contains PFAS.[23]  An even broader law was passed in Maine in July 2021 that bans PFAS in nearly all products, stating as of Jan. 1, 2030, "a person may not sell, offer for sale or distribute for sale" in Maine products where PFAS has been "intentionally added" except in cases of "unavoidable use."[24]  Similar legislation has also been passed in Vermont and Washington.[25]

59.     In 2018, 3M reached an $850 million settlement with the State of Minnesota brought by the Attorney General alleging that 3M's production of PFAS damaged the drinking water and resources throughout the Minneapolis/St. Paul area, including within residential areas.[26]

60.     A similar personal injury case was filed on behalf of citizens of West Virginia against DuPont related to discharges of PFAS from a manufacturing site into local water sources. That case settled in 2017 for $671 million.[27]

61.     As the risks associated with PFAS become more widely known, it is likely that consumer awareness will continue to grow. It is reasonable for consumers to be concerned about these chemicals, which carry significant health risks and are often undisclosed by manufacturers.

---

[22] *Id.*

[23] https://portal.ct.gov/Office-of-the-Governor/News/Press-Releases/2021/07-2021/Governor-Lamont-Signs-Legislation-Banning-Use-Of-PFAS

[24] https://www.reuters.com/legal/litigation/maine-outlaws-pfas-products-with-pioneering-law-2021-07-16/

[25] https://www.natlawreview.com/article/connecticut-and-vermont-ban-pfas-food-packaging

[26] https://3msettlement.state.mn.us/

[27] https://www.reuters.com/article/us-du-pont-lawsuit-west-virginia/dupont-settles-lawsuits-over-leak-of-chemical-used-to-make-teflon-idUSKBN15S18U

## III.   THE USE OF PFAS IN COSMETIC PRODUCTS

62.   PFAS have long been used in a variety of cosmetic products that come into contact with the skin, including lotions, cleansers, nail polish, shaving cream, foundation, lipstick, eyeliner, eyeshadow, and mascara.

63.   PFAS are used in cosmetic products as emulsifiers, antistatics, stabilizers, surfactants, film formers, viscosity regulators, and solvents. PFAS may be added to products to make them more water-resistant, durable, and spreadable.

64.   Certain commonly used PFAS may be identified on a cosmetic product's label or on its ingredient list.

65.   The most common PFAS identified and/or disclosed as ingredients in cosmetic products are polytetrafluoroethylene (PTFE), perfluorooctyl triethoxysilane, perfluorononyl dimethicone, perfluorodecalin, and perfluorohexane.

66.   PTFE is known by its brand name, Teflon. According to a 2018 market analysis, Teflon was disclosed as an ingredient in 66 different cosmetic products from 15 brands. Teflon was the most common PFAS compound identified in a product's ingredient list.[28]

67.   This 2018 market analysis identified 13 different PFAS compounds in nearly 200 products from 28 brands.[29]  These compounds were intentionally added ingredients disclosed in each product's ingredient list. That said, a reasonable consumer would be unlikely to identify most

---

[28] https://www.ewg.org/skindeep/contents/is-teflon-in-your-cosmetics/#.Wqk_bb3wajT

[29] PFAS compounds identified by the analysis included: (i) PTFE, (ii) perfluorononyl dimethicone, (iii) perfluorodecalin, (iv) C9-15 fluoroalcohol phosphate, (v) octafluoropentyl methacrylate, (vi) perfluorohexane, (vii) pentafluoropropane, (viii) polyperfluoroethoxymethoxy difluoroethyl peg phosphate, (ix) polyperfluoroethoxymethoxy peg-2 phosphate, (x) methyl perfluorobutyl ether, (xi) perfluorononylethyl carboxydecyl peg-10 dimethicone, (xii) perfluorodimethylcyclohexane, and (xiii) perfluoroperhydrophenanthrene.

of the compounds as part of the PFAS family simply by looking at the name of the ingredient.

68.     Even where PFAS are identified in a product's ingredient list, the quantity of the PFAS contained in the product is not disclosed.

69.     Because there are no formal federal regulations governing what cosmetic labels must disclose, many cosmetic products that contain PFAS do not disclose this on the product label or on the ingredient list.

70.     The 2018 market analysis reviewed only PFAS ingredients that were disclosed in an ingredient list or product label. Disclosed PFAS ingredients, however, make up only a fraction of the PFAS contained in cosmetic products.

71.     PFAS occurs in cosmetic products both as an intended ingredient and as degradation products and impurities from the production of certain PFAS precursors used in certain products.

72.     Prior to 2021, no scientific research had been published analyzing whether PFAS were present in cosmetic products where the label did not disclose the presence of any such compounds.

73.     In June 2021, researchers at Notre Dame published a peer-reviewed analysis of 231 cosmetic products using particle-induced gamma ray emission (PIGE) to screen for total fluorine. Researchers analyzed lip products, eye products, foundations, face products, mascaras, concealers, and eyebrow products purchased from retailers such as Ulta Beauty, Sephora, Target, and Bed Bath & Beyond.[30]

74.     Because all PFAS are comprised of carbon-fluorine bonds, analyzing a product for

---

[30] https://pubs.acs.org/doi/10.1021/acs.estlett.1c00240

total fluorine is a method to investigate whether PFAS are present.

75.     Foundations produced the highest median total fluorine concentration, while mascaras produced the largest range of total fluorine measurements. Several mascaras gave the highest fluorine concentrations measured. The three product categories with the highest proportion of fluorine concentrations were foundations, mascaras, and lip products.

76.     Researchers found high fluorine levels in products commonly advertised as "wear-resistant" to water and oils or "long-lasting," including foundations, liquid lipsticks, and waterproof mascaras. Industrial and consumer products containing PFAS are often described as water or stain-resistant.

77.     Researchers performed a further analysis of 29 foundations, mascaras, and lip products using liquid chromatography-tandem mass spectrometry and gas chromatographic mass spectrometry.

78.     This further analysis revealed that short-chain PFAS were most commonly detected in these products.

79.     However, researchers also found that the 29 products also contained long-chain PFAS.

80.     Only 8% of the 231 cosmetics screened for total fluorine listed any PFAS as an ingredient and only 3% of the 29 products in the second round of testing listed any PFAS as an ingredient. Long and short-chain PFAS were detected in all 29 products analyzed in the second round of testing, meaning that very few disclosed that PFAS were present in the product.

81.     Some cosmetic product ingredients, such as mica, talc, silica, Nylon-12, and color additives, are treated with PFAS to provide hydrophobic properties.

82.     The use of PFAS in cosmetic products is likely to cause unwanted or unforeseen

human exposures. Consumers may inadvertently ingest PFAS from liquid lip products or absorb PFAS from mascara through their tear ducts. PFAS may be absorbed through the skin from foundations or other products that require dermal applications.

83.    In addition, PFAS in cosmetic products contributes to PFAS entering wastewater streams and causes ecosystem exposures when those products are discarded in landfills.

84.    Because many PFAS are not disclosed on product labels or in a product's ingredient list, consumers are likely unaware of their personal exposure, as well as their contribution to ecosystem exposures.

85.    Following publication of the June 2021 research, the federal government moved to curtail the widespread inclusion of PFAS in cosmetic products.

86.    In June 2021, bipartisan legislation was introduced in the U.S. Senate by Senator Susan Collins (R-ME) and Senator Richard Blumenthal (D-CT) that would ban PFAS in cosmetic products, including makeup, moisturizer, and perfume. That proposed legislation would direct the FDA to issue a proposed rule banning the intentional addition of PFAS in cosmetics within 270 days of the law's enactment and require a final rule to be issued 90 days thereafter.[31]   Similar legislation was introduced in the House of Representatives as well by Representatives Debbie Dingell (D-MI), Brian Fitzpatrick (R-PA), Annie Kuster (D-NH), and John Katko (R-NY).[32]

87.    Members of the scientific community support this proposed legislation. Arelene Blum, PhD, who is the executive director of the Green Science Policy Institute and a co-author of the Notre Dame study, stated, "PFAS chemicals are not necessary for makeup. Given their large

---

[31] https://www.collins.senate.gov/newsroom/collins-blumenthal-introduce-bill-ban-pfas-chemicals-cosmetics

[32] https://debbiedingell.house.gov/news/documentsingle.aspx?DocumentID=3097

potential for harm, I believe they should not be used in any personal care products." And Scott Faber, the Senior Vice President of Government Affairs for the Environmental Working Group stated, "Toxic forever chemicals have no place in personal care products."[33]

## IV.   INDEPENDENT LAB TESTING CONFIRMS PRESENCE OF PFAS IN CERTAIN L'OREAL COSMETIC PRODUCTS

88.     After publication of the study conducted by Notre Dame researchers, independent third-party testing was performed to determine whether certain L'Oreal cosmetic products contained PFAS.

89.     To perform this testing, the independent laboratory utilized industry standard techniques to detect PFAS constituents in cosmetic products.

90.     Independent testing from a third-party lab determined that PFAS, including certain long-chain PFAS like PFOA, were present within several popular L'Oreal waterproof mascara products, including L'Oreal Voluminous Waterproof Mascara, Voluminous Lash Paradise™ Waterproof Mascara, Maybelline Volum' Express the Falsies Waterproof Mascara, Maybelline Volum' Express Total Temptation Waterproof Mascara, Maybelline Great Lash Waterproof Mascara, and Maybelline Total Temptation Waterproof Mascara (collectively, the "Waterproof Mascara Products").

91.     The presence of PFAS in a cosmetic product that is applied to the eye is material to Plaintiff, customers, and members of the putative class.

92.     As set forth below, none of the Waterproof Mascara Products identified herein disclose to the consumer that they contain PFAS that were detected during testing.

---

[33] https://www.collins.senate.gov/newsroom/collins-blumenthal-introduce-bill-ban-pfas-chemicals-cosmetics

## V.   L'OREAL'S MISLEADING ADVERTISING OF ITS WATERPROOF MASCARA PRODUCTS

93.   Defendant L'Oreal is one of the largest cosmetics companies in the world, generating over $7 billion in sales per year in the U.S. alone.[34] It owns and operates over 30 different beauty brands from its headquarters in New York City, and employs over 12,000 people in facilities across 14 different states.[35]

94.   According to L'Oreal, its mission is to bring "innovative, effective, high-quality products to our consumers around the world," and to do this L'Oreal selects suppliers "who are experts in their field" to ensure "the quality, effectiveness and traceability of our products."[36]

95.   L'Oreal develops all of its own products and employs 4,000 people in its Research & Innovation centers around the world. L'Oreal claims its research "provid[es] a continuously improving response to the Beauty needs and aspirations of consumers, while the products they create are ever more effective, and provide the highest standards of quality and safety."[37]

96.   L'Oreal touts its commitment to research, proudly declaring on its website that it employs over 470 U.S.-based researchers and scientists.[38]  The L'Oreal Paris brand website states that its products are "Rooted in Science" and "based on the deepest knowledge thanks to its 4000 researchers and 21 scientific research centers around a [sic] world."[39]

97.   L'Oreal claims that "The Quality and Safety of Our Products Are Our Priority" and

---

[34] https://www.loreal.com/en/usa/

[35] *Id.*

[36] https://www.loreal.com/en/audiences/suppliers/

[37] https://www.loreal.com/en/beauty-science-and-technology/beauty-research-and-innovation/

[38] *Id.*

[39] https://www.loreal.com/en/consumer-products-division/loreal-paris/

that it is "Going above and beyond industry standards" by "providing the best [] ingredients, formulation, and performance [] in each and every one of our products."[40]

98.     One of L'Oreal's brands is its popular "L'Oreal Paris" cosmetics line, consisting of makeup (including mascara, lipstick, foundation, etc.), skin care (including eye cream, moisturizer, sunscreen, etc.), hair color (including permanent and semi-permanent color, hair highlights, and root touch up, etc.), hair care (including shampoo, conditioner, hair masks, etc.), and hair style (including hair gel, hair spray, heat protectant, etc.).[41]

99.     Within its "L'Oreal Paris" branded makeup line, L'Oreal offers ten different "waterproof" mascara products out of its 27 mascara products.[42]   L'Oreal also owns the Maybelline cosmetic brand and offers a number of "waterproof" mascaras under this brand.

100.    Of these products, Plaintiff's testing has thus far determined that the Waterproof Mascara Products contain undisclosed PFAS.

101.    Upon information and belief, discovery is likely to reveal that additional Waterproof Mascara Products contain PFAS that is not disclosed on the product label or packaging.

102.    Defendant formulated, developed, manufactured, labeled, distributed, marketed, advertised, and sold the Waterproof Mascara Products throughout the United States, including in this District, during the Class Period.

103.    The packaging, labeling, and ingredient lists of the Waterproof Mascara Products

---

[40] https://www.loreal.com/en/commitments-and-responsibilities/for-our-products/product-quality-and-safety/

[41] https://www.lorealparisusa.com/

[42] *See* https://www.lorealparisusa.com/makeup/eye/mascara?page=2.

that Plaintiff and the Class relied upon when making their purchases of the Waterproof Mascara Products were prepared, reviewed, and/or approved by Defendant and their agents, and were disseminated by Defendant and their agents through the packaging, labeling, and ingredient lists that contained the misrepresentations and omissions alleged herein.

104.    Defendant intended for consumers, such as Plaintiff, to rely on the statements and omissions on the packaging, labeling, and ingredient lists of the Waterproof Mascara Products when deciding to purchase them. As a result of Defendant's misrepresentations and omissions, reasonable consumers, including the Plaintiff and the Class, were misled into purchasing the Waterproof Mascara Products when, if they had known the truth about the presence of PFAS, they would not have purchased them at all or would have paid less for those products.

105.    L'Oreal owns, manufactures, and distributes the Waterproof Mascara Products and created, allowed, negligently oversaw, and/or authorized the unlawful, fraudulent, unfair, misleading, and/or deceptive packaging, labeling, and ingredient lists of the Waterproof Mascara Products.

106.    Defendant is responsible for selecting and sourcing the ingredients used in the Waterproof Mascara Products and for conducting all relevant quality assurance protocols, including testing, for the Waterproof Mascara Products. Therefore, Defendant knew, or should have known, that failing to disclose the presence of detectable levels of PFAS was a material omission and that it was concealing the true quality, nature, and safety of the Waterproof Mascara Products.

107.    None of the Waterproof Mascara Products disclose on the packaging, labeling, or ingredient list that the mascara contains detectable levels of PFAS, including PFOA, PFHxA, PFDoS, and NEtFOSE, among others.

108.    In addition, several of the Waterproof Mascara Products contain misrepresentations that would lead a reasonable consumer to conclude the products are safe and do not contain harmful carcinogenic PFAS compounds.

109.    L'Oreal's Voluminous Waterproof Mascara, for example, states that the product is "ophthalmologist and allergy tested. Suitable for sensitive eyes and contact lens wearers."

110.    An image of the product packaging is set forth below:



111.    L'Oreal's Voluminous Lash Paradise Waterproof Mascara contains similar

misrepresentations, stating that it is "ophthalmologist and allergy tested. Suitable for sensitive

eyes. Tested under dermatological control for safety."



112.    Maybelline's Volum' Express the Falsies Waterproof Mascara and Maybelline the

Colossal Waterproof Mascara both state that the product is "ophthalmologist tested. Suitable for

contact wearers."



the
# FALSIES™
◀ FALSE LASH EFFECT MASCARA ▶
◀ MASCARA EFFET FAUX CILS ▶
◀ MASCARA EFECTO PESTAÑAS POSTIZAS ▶
VOLUM EXPRESS™

**VERY BLACK**
**NOIR INTENSE**
**NEGRO INTENSO**
0727211



## WASHABLE MASCARA

▸ **INSTANT FALSE LASH LOOK:** Kera-fiber infused formula builds corner to corner volume and fills gaps, does not clump. Flexible spoon brush easily glides through lashes, scooping and coating from root to tip. Ophthalmologist tested. Suitable for contact lenses.

▸ **TO USE:** For best results, hold brush with spoon side against lashes and sweep from root to tip. Repeat until desired look is achieved. Do not let dry between coats.

TO SAFEGUARD MAYBELLINE PURITY, RESERVE THIS PRODUCT FOR YOUR PERSONAL USE. TREAT THE APPLICATOR WITH THE HYGIENIC CARE YOU GIVE YOUR EYES. NEVER APPLY THIS PRODUCT IN A MOVING VEHICLE. DO NOT DILUTE MASCARA WITH WATER, SALIVA OR ANY OTHER SUBSTANCE. CAP TIGHTLY AFTER USE. IF CHANGE IN ODOR OR APPEARANCE OCCURS, DISCONTINUE USE. DO NOT USE THIS OR ANY OTHER EYE COSMETIC IF YOUR EYE IS INJURED, IRRITATED, OR INFECTED. CONSULT A PHYSICIAN PROMPTLY.

## MASCARA LAVABLE

▸ **LOOK FAUX CILS INSTANTANÉ :** La formule enrichie de kéra-fibre procure un volume d'un coin à l'autre et remplit les espaces, sans grumeaux. La brosse flexible en forme de cuillère glisse facilement sur les cils, les soulève et les enrobe de la racine à la pointe. Testé sous contrôle ophtalmologique. Convient au port de lentilles cornéennes.

▸ **MODE D'EMPLOI :** Pour de meilleurs résultats, tenez la brosse avec le côté recurvé contre les cils et appliquez de la racine à la pointe. Répétez jusqu'à l'obtention de l'effet désiré. Ne laissez pas sécher entre les applications des différentes couches.

POUR CONSERVER LA PURETÉ DE VOTRE PRODUIT MAYBELLINE, N'EMPLOYEZ CE PRODUIT QUE POUR VOTRE UTILISATION PERSONNELLE. APPLIQUEZ LES MÊMES RÈGLES D'HYGIÈNE POUR L'APPLICATEUR QUE POUR VOS YEUX. N'APPLIQUEZ JAMAIS CE PRODUIT DANS UN VÉHICULE EN MOUVEMENT. NE LE DILUEZ PAS AVEC DE L'EAU, DE LA SALIVE OU TOUTE AUTRE SUBSTANCE. REFERMEZ HERMÉTIQUEMENT APRÈS USAGE. CESSEZ L'UTILISATION SI VOUS CONSTATEZ UN CHANGEMENT DANS L'ODEUR OU L'APPARENCE DU PRODUIT. N'UTILISEZ PAS CE PRODUIT OU TOUT AUTRE PRODUIT COSMÉTIQUE POUR LES YEUX SI VOUS AVEZ UNE BLESSURE, UNE IRRITATION OU UNE INFECTION À L'ŒIL. DANS UN TEL CAS, CONSULTEZ IMMÉDIATEMENT UN PROFESSIONNEL DE LA SANTÉ.

## MASCARA DE PESTAÑAS LAVABLE

▸ **LOOK PESTAÑAS POSTIZAS AL INSTANTE:** Fórmula con fibras pro-keratina, rellena los espacios entre las pestañas y aporta volumen al instante de extremo a extremo sin grumos. Cepillo flexible en forma de cuchara, se extiende fácilmente entre las pestañas, cubriéndolas de la raíz a la punta. Probado bajo control oftalmológico. Adecuado para usuarias de lentes de contacto.

▸ **MODO DE USO:** Para mejores resultados, utiliza el cepillo con el lado curvo hacia las pestañas y extiende de la raíz a la punta. Repite hasta lograr el look deseado. No dejes secar entre capas.

PARA PRESERVAR LA PUREZA DE ESTE PRODUCTO MAYBELLINE, RESÉRVALO PARA USO PERSONAL. TRATA AL APLICADOR CON EL MISMO CUIDADO HIGIÉNICO QUE TUS OJOS. NO APLIQUES EL PRODUCTO EN UN VEHÍCULO EN MOVIMIENTO. NO DILUYAS LA MASCARA CON AGUA, SALIVA U OTRA SUSTANCIA. CIERRA BIEN LA TAPA DESPUÉS DE USARLA. SI EXISTE UN CAMBIO EN OLOR O APARIENCIA, SUSPENDE SU USO. NO UTILICES ÉSTE NI OTRO PRODUCTO COSMÉTICO SI TIENES LOS OJOS LASTIMADOS, INFECTADOS O IRRITADOS. CONSULTA A UN MÉDICO DE INMEDIATO.

**INGREDIENTS:** CI/158 1 AQUA/WATER/EAU, PARAFFIN, POTASSIUM CETYL PHOSPHATE, CERA ALBA/BEESWAX/CIRE D'ABEILLE, COPERNICIA CERIFERA CERA/CARNAUBA WAX/CIRE DE CARNAUBA, ACACIA SENEGAL GUM, GLYCERIN, CETYL ALCOHOL, ACRYLATES COPOLYMER, HYDROXYETHYLCELLULOSE, PHENOXYETHANOL, PEG/PPG-17/18 DIMETHICONE, STEARETH-20, HYDROLYZED CORN STARCH, SILICA, CAPRYLYL GLYCOL, SODIUM POLYMETHACRYLATE, SODIUM DEHYDROACETATE, HYDROGENATED JOJOBA OIL, HYDROGENATED PALM OIL, SIMETHICONE, RAYON, DISODIUM EDTA, STEARYL ALCOHOL, ARGININE, SERINE, MYRISTYL ALCOHOL, GLUTAMIC ACID, 2-OLEAMIDO-1,3-OCTADECANEDIOL, PANTHENOL, LAURETH-21, BHT. [+/- MAY CONTAIN/PEUT CONTENIR: CI 77491, CI 77492, CI 77499/IRON OXIDES, CI 77007/ULTRAMARINES, CI 75470/CARMINE, CI 77891/TITANIUM DIOXIDE, MICA, CI 77288/CHROMIUM OXIDE GREENS, CI 77289/CHROMIUM HYDROXIDE GREEN, CI 77742/MANGANESE VIOLET, CI 77510/FERRIC FERROCYANIDE] F.I.L.# D37314/5

6M

M A Y B E L L I N E®
MAYBELLINE LLC, NEW YORK, NY 10001 • IMP. BY/PAR MAYBELLINE CANADA, MONTRÉAL, H4T 1K5
Made in USA of US and/or imported ingredients • Fait aux É.-U. avec des ingrédients américains
et/ou importés • Hecho en E.U.A. con ingredientes nacionales y/o importados • www.maybelline.com

0 4155421796 4



113.    Maybelline Great Lash Waterproof Mascara states that it is "contact lens safe" and

"hypoallergenic."



114.    These misrepresentations are likely to mislead a reasonable consumer, including Plaintiff, into believing the Waterproof Mascara Products are safe for use and do not contain carcinogenic and/or toxic PFAS compounds not disclosed on the product label or packaging.

## VI.    PLAINTIFF'S USE OF L'OREAL'S WATERPROOF MASCARA PRODUCTS

115.    Plaintiff Rebecca Vega has been purchasing Maybelline Great Lash Waterproof Mascara, L'Oreal Voluminous Waterproof Mascara interchangeably, for years.

116.     Plaintiff Vega has had LASIK eye surgery performed once and has sensitive eyes, which requires her to use Lubricating eye drops.

117.     Because of her eye health issues, when purchasing the Mascara, Plaintiff Vega viewed and relied on the statements that L'Oréal Voluminous Waterproof Mascara and Maybelline Great Lash Waterproof Mascara is "ophthalmologist tested. Suitable for contact wearers," that Great Lash is "contact lens safe" and "hypoallergenic," and that Voluminous is "ophthalmologist and allergy tested. Suitable for sensitive eyes and contact lens wearers."

118.     As a result of Defendant's misrepresentations and omissions, Plaintiff Vega purchased the Mascaras because she reasonably believed they were safe for use around, adjacent to, and near her eyes.

119.     Plaintiff Vega followed the instructions and applied the Mascaras around her eyes.

120.     Plaintiff Vega estimates that she has purchased each of the Mascaras at least 10 times per year since 1973. Prior to purchase, Plaintiff Vega saw and relied upon Defendant's packaging and the ingredient lists for each of the Mascaras when making her decision to purchase one of the Waterproof Mascara Products.

121.     Plaintiff Vega, like other reasonable consumers, reasonably relied on Defendant's packaging, labeling, ingredient list, and disclosures when deciding to purchase one of the Waterproof Mascara Products.

122.     Plaintiff Vega was unaware that the Waterproof Mascara Products contained detectable levels of PFAS.

123.     Plaintiff Vega would not have purchased the Mascaras, or would have paid less for them, had she known that they contained and/or had a material risk of containing dangerous PFAS. In fact, Plaintiff Vega has stopped using Mascaras since learning they contain PFAS.

124.    The Waterproof Mascara Products were misleadingly advertised. As a result of Defendant's negligent, reckless, and/or knowingly deceptive conduct, Plaintiff Vega was injured by purchasing, at a premium price, the Waterproof Mascara Products that were not of the quality and safety promised and that Plaintiff would not have purchased if she had not been misled by Defendant.

125.    If Plaintiff Vega or the members of the putative Class were to encounter the Waterproof Mascara Products in the future, they could not reasonably rely on the truthfulness of the packaging unless Defendant's packaging and labeling corrected the misleading packaging omission.

## VII.    DEFENDANT'S PACKAGING CLAIMS MISLED AND DECEIVED CONSUMERS

126.    Defendant's packaging claimed the Waterproof Mascara Products were safe and did not contain harmful carcinogenic PFAS compounds. These misrepresentations and omissions are misleading to consumers because the Waterproof Mascara Products do in fact contain and/or have a material risk of containing PFAS.

127.    Reasonable consumers, including Plaintiff and the Class, paid Defendant a price premium for the Waterproof Mascara Products because the consumers relied on the accuracy of the disclosures and statements on Defendant's packaging, labels, and ingredient list

128.    Reasonable consumers, including Plaintiff and the Class, considered the above packaging claims to be material to their decision to purchase the Waterproof Mascara Products.

129.    Defendant knew or should have known, yet failed to disclose, that the Waterproof Mascara Products contained and/or had a material risk of containing PFAS, and thus did not conform to the packaging claims.

130.    Defendant also knew or should have known that the presence or material risk of

PFAS were a material consideration to consumers like Plaintiff and the Class when they purchased the Waterproof Mascara Products.

131.    A reasonable consumer would not have paid the price premium for the Products if they had known that the Waterproof Mascara Products contained or had a material risk of containing PFAS.

132.    In fact, reasonable consumers, including Plaintiff and the Class, would have refused to purchase the Waterproof Mascara Products entirely if they had known that the Products contained or had a material risk of containing PFAS.

133.    As a result of Defendant's misleading packaging claims and omissions, consumers like Plaintiff and the Class suffered substantial financial losses by paying premium prices for the Waterproof Mascara Products that did not conform to their packaging claims. Not only that, but Plaintiff and Class Members have incurred costs to prematurely replace the product and costs to discontinue use of the product before its expiration.

## VIII.    CONSUMER RELIANCE WAS REASONABLE AND FORESEEABLE

134.    Plaintiff and the Class reasonably relied upon Defendant's misleading packaging claims and omissions when making their decision to purchase the Waterproof Mascara Products.

135.    Any reasonable consumer would consider the packaging and labeling of a cosmetics product. At the time of purchase, Plaintiff and the Class had no opportunity to discover the truth about Defendant's omission of the presence or risk of PFAS in the Waterproof Mascara Products.

136.    Consumers reasonably relied upon Defendant's misleading packaging claims as objective statements that communicated, represented, and advertised that the Waterproof Mascara Products had specific product characteristics.

137.    Defendant knew, or should have known, that Plaintiff and the Class would rely on

their misleading packaging claims. Defendant designed and had control over the Waterproof Mascara Products' packaging, including omitting information about the presence or risk of PFAS, in order to target and induce consumers like Plaintiff and the Class to purchase the Product at the advertised price.

138.    Plaintiff and the Class are intended third-party beneficiaries of any implied warranty between L'Oreal and retailers. Retailers were not intended to be the ultimate consumers of the Waterproof Mascara Products as any implied warranty that exists was intended to benefit consumers.

## IX.    DEFENDANT'S KNOWLEDGE OF THE MISREPRESENTATIONS AND OMISSIONS

139.    Defendant had exclusive knowledge of the contents and formula of its Waterproof Mascara Products, including whether they contained or were at a risk of containing PFAS.

140.    Defendant also had exclusive knowledge of its ingredient suppliers and could have obtained information from their suppliers about the contents of the ingredients, including whether they contained or were at risk of containing PFAS.

141.    Consumers like Plaintiff and the Class were unable to determine or identify that Defendant's Waterproof Mascara Products contained or were at risk of containing PFAS given the Products' mislabeling and failure to disclose the presence or risk of PFAS.

## X.    DEFENDANT ACTED NEGLIGENTLY AND/OR INTENTIONALLY TO MISLEAD CONSUMERS

142.    Defendant acted negligently and/or intentionally to deceive consumers, including Plaintiff and the Class, through its misleading Waterproof Mascara Product packaging that did not disclose the presence or risk of PFAS in the Products.

143.    Defendant did so despite knowing that the presence and/or material risk of PFAS in the Waterproof Mascara Products, as well as knowing that PFAS could be eliminated from its

Products. Defendant knew that consumers like Plaintiff and the Class trusted and relied on Defendant to ensure that the Waterproof Mascara Products conformed to their packaging claims and did not contain undisclosed PFAS.

## XI.    TOLLING OF STATUTES OF LIMITATIONS

144.    Any applicable statute of limitations has been tolled by Defendant's knowing and active concealment of the presence or risk of PFAS in the Waterproof Mascara Products and the misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiff and members of the Class were deceived regarding the Waterproof Mascara Products and could not reasonably discover that they contained, or may contain, PFAS.

145.    Plaintiff and members of the Class did not discover and did not know of any facts that would have caused a reasonable person to expect that the Defendant was concealing the presence or risk of PFAS in the Waterproof Mascara Products. As alleged herein, the presence or risk of PFAS in the Waterproof Mascara Products was material to Plaintiff and members of the Class at all relevant times. Within the time period of any applicable statute of limitations, Plaintiff and members of the Class would not have discovered through the existence of reasonable diligence that the Waterproof Mascara Products contain, or may contain, PFAS.

146.    At all times, Defendant is and was under a continuous duty to disclose to Plaintiff and the Class the true standard, quality, and grade of the Waterproof Mascara Products and to disclose the presence or risk of PFAS due to its exclusive and superior knowledge of the contents and ingredient sourcing for the Waterproof Mascara Products.

147.    Defendant knowingly, actively, and affirmatively concealed the facts alleged herein. Plaintiff and members of the Class reasonably relied on Defendant's knowing, active, and affirmative concealment.

148.    For these reasons, all applicable statutes of limitation have been tolled based on the

discovery rule and Defendant's fraudulent concealment, and Defendant is estopped from relying on any statues of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

149.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and the classes. This action satisfies the requirements set forth in Rule 23(a) and Rule 23(b)(3).

150.   Plaintiff brings this action on behalf of the following class(es) (together referred to as the "Class"):

> **Nationwide Class:** All individuals in the United States who purchased the Waterproof Mascara Products from 2018 to the present; and/or

> **New Jersey Subclass:** All individuals in the State of New Jersey who purchased the Waterproof Mascara Products from 2018 to the present.

151.   Excluded from the Class are Defendant, its legal representatives, assigns and successors, and any entity in which Defendant has a controlling interest. Also excluded is the judge to whom this case is assigned and any member of the judge's immediate family and judicial staff. Claims for personal injury are specifically excluded from the Class.

152.   This action is brought and may be properly maintained as a class action. There is a well-defined community of interests in this litigation and the members of the Class are easily ascertainable.

153.   Numerosity (Rule 23(a)(1)): Although the actual size of the Class is uncertain, Plaintiff is informed and believes that the Class is comprised of at least thousands of purchasers of the Waterproof Mascara Products, making joinder impracticable. The disposition of the claims of the Class in a single action will provide substantial benefits to the parties and the Court.

154.   Commonality (Rule 23(a)(2)): Questions of law and fact common to Plaintiff and the Class include, but are not limited to, the following:

a.   Whether Defendant owed a duty of care to Plaintiff and the Class;

b.   Whether the Waterproof Mascara Products contained detectable levels of PFAS;

c.   Whether Defendant knew or should have known that the Waterproof Mascara Products contained detectable levels of PFAS not disclosed on the product label and/or packaging;

d.   Whether Defendant failed to test, or require its suppliers to test, the Waterproof Mascara Products and their ingredients for the presence of PFAS;

e.   Whether Defendant failed to disclose that the Waterproof Mascara Products contained PFAS;

f.   Whether Defendant wrongfully represented that the Waterproof Mascara Products were safe for use and did not include toxic PFAS substances;

g.   Whether Defendant wrongfully represented, and continues to represent, that the Waterproof Mascara Products are safe for use on eyes and high-quality;

h.   Whether reasonable consumers would consider that the Waterproof Mascara Products containing detectable levels of PFAS to be a material fact in purchasing the Waterproof Mascara Products;

i.   Whether Defendant continued to manufacture and sell the Waterproof Mascara Products despite knowing that they contain detectable levels of PFAS;

j.   Whether Defendant's omission of the presence of PFAS in the Waterproof Mascara Products was likely to mislead, deceive, confuse, or confound consumers acting reasonably;

k.   Whether Defendant violated New Jersey law;

l.   Whether Defendant engaged in deceptive acts and practices;

m.   Whether Defendant engaged in false advertising;

n.   Whether Defendant unjustly enriched itself at consumers' expense;

o.   Whether Plaintiff and the Class are entitled to actual, statutory, and treble damages; and

p.   Whether Plaintiff and the Class are entitled to declaratory and injunctive relief.

155.   Typicality (Rule 23(a)(3)): The claims of the representative Plaintiff are typical of the claims of members of the Class, in that the representative Plaintiff, like all members of the Class, purchased the Waterproof Mascara Products from Defendant without knowing that it contained detectable levels of PFAS and, if Plaintiff, like all members of the Class, had known

that information, she would not have purchased the products or would have paid less for them. Thus, the representative Plaintiff, like all members of the Class, has suffered a common injury. The factual basis of Defendant's misconduct is common to all members of the Class.

156.    Adequacy (Rule 23(a)(4)): Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting consumer class actions, including actions involving mislabeling and false advertising, product liability, and violation of consumer protection statutes. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor her counsel have any interests adverse to those of the Class.

157.    Predominance of Common Questions (Rule 23(b)(3)): Common questions of law and fact predominate over any questions involving individualized analysis. There are no fundamental questions of fact or law that are not common to members of the Class. The undisclosed presence of PFAS in the Waterproof Cosmetics Products is a common question, as is the Defendant's knowledge regarding the presence of detectable levels of PFAS in its Waterproof Mascara Products and Defendant's unform omission to members of the Class of this material fact. Common questions of law include whether Defendant's conduct violates state consumer protection statutes and other laws, and the Class members' entitlement to damages and remedies.

158.    Superiority (Rule 23(b)(3)): Plaintiff and members of the Class have suffered and will continue to suffer harm and damages as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the subject controversy. Most members of the Class likely would find the cost of litigating their individual claims to be prohibitive and will have no adequate remedy at law. Thus, absent a class action, members of the Class will continue to incur damages and Defendant's misconduct will

proceed without remedy. Class treatment of common questions of fact and law is superior to multiple individual actions or piecemeal litigation because it will conserve the resources of the courts and the litigants and promote consistency and efficiency of adjudication. There is no impediment to the management of this action as a class action because the questions of fact and law are virtually identical for Plaintiff and all Class members.

159.    Injunctive Relief (Rule 23(b)(2)): Defendant has engaged in, and continues to engage in, business practices which are unfair and fraudulent by, among other things, failing to disclose the material fact that the Waterproof Mascara Products contain detectable levels of PFAS. Plaintiff seeks class-wide injunctive relief on grounds consistent with the standards articulated in Rule 23(b)(2) that establish final injunctive relief as an appropriate class-wide remedy, in that Defendant continues to manufacture, market, and sell the Waterproof Mascara Products and omit material facts. The injuries suffered by Plaintiff and the Class as a result of Defendant's actions are ongoing.

## **CAUSES OF ACTION**

## **FIRST CAUSE OF ACTION**

### **Fraud**
### **(On Behalf of Plaintiff and the Nationwide Class or,**
### **in the Alternative, the New Jersey Subclass)**

160.    Plaintiff incorporates by reference all preceding allegations contained in this Complaint.

161.    Plaintiff brings this cause of action for herself and on behalf of the Nationwide Classes under the common law of fraud, which is materially uniform in all states.  In the alternative, Plaintiff brings this claim on behalf of the New Jersey Subclass.

162.    As described above, Defendant defrauded Plaintiff and Class Members by knowingly and intentionally misrepresenting to them and to the public at large.  Defendant engaged

in material and misleading labeling and advertising of its Waterproof Mascara Products by statements and omission.

163.    Defendant's Waterproof Mascara Products contains and/or has a material risk of containing PFAS—a fact it omitted to disclose—and Defendant misrepresented that its Products were safe for use on eyes. Defendant knew or should have known that its Waterproof Mascara Products should not contain PFAS and that by manufacturing and providing for commercial sale Waterproof Mascara Products containing and/or having a material risk of containing PFAS, Plaintiff and Class members were not getting safe products to use on a sensitive part of the face, the eye.

164.    Plaintiff and Class members would not have purchased the Waterproof Mascara Products at issue had they known the truth about the presence of PFAS. There is no other use for Defendant's tainted Products.

165.    Plaintiff and Class members had no reasonable means of knowing that Defendant's representations were false and misleading, or that Defendant had omitted to disclose material details relating to Defendant's tainted Products.  Plaintiff and Class Members did not and could not reasonably discover Defendant's concealment on their own.

166.    Defendant had a duty to disclose, rather than conceal and suppress, the full scope and extent of the defects in its Products because:

     a.    Defendant had exclusive or far superior knowledge of the PFAS in its Waterproof Mascara Products and concealment thereof;

     b.    The details regarding PFAS in its Waterproof Mascara Products and concealment thereof were known and/or accessible only to Defendant; and

     c.    Defendant knew Plaintiff and Class Members did not know about the PFAS in its Waterproof Mascara Products and concealment thereof and that the untrained

observer would not be able to detect the inherent defects in the Waterproof Mascara Products.

167.    Defendant committed fraud by designing, manufacturing, marketing, and selling Waterproof Mascara Products containing and/or having a material risk of containing PFAS and failing to properly represent, both by affirmative conduct and by omission, the actual contents of its Waterproof Mascara Products.

168.    If Defendant had not sold Waterproof Mascara Products containing and/or having a material risk of containing PFAS, Plaintiff and Class members would not have suffered the extent of damages caused by Defendant's sales.

169.    Defendant's advertisements and labels for its Waterproof Mascara Products are fraudulent in that, among others things, Defendant actively and knowingly misrepresented or omitted disclosure of material information, including the fact that Defendant's Products contained PFAS, on the labels and advertisements, knowing that Plaintiff and Class members would see and rely on the labels at the time they purchased the Waterproof Mascara Products, and that Defendant failed to disclose and give timely warnings or notices regarding the presence of PFAS in its Waterproof Mascara Products that were purchased by Plaintiff and Class members.

170.    The conduct alleged herein constitutes an unconscionable business practice in that Defendant has, by the use of false statements and/or material omissions in its labels and advertisements, failed to properly represent and/or concealed the presence of detectable levels of PFAS in its Waterproof Mascara Products.

171.    Members of the public, including Plaintiff and Class members, were deceived by and relied upon Defendant's affirmative misrepresentations and failures to disclose.

172.    Such material and misleading advertisements and labels designed and disseminated

by Defendant are and were likely to mislead a reasonable consumer purchasing Waterproof Mascara Products.

173.    To this day, Defendant continues to engage in unlawful misleading advertising. Defendant continues to conceal the defective nature of the Waterproof Mascara Products and has failed to disclose, on inquiry from Plaintiff and Class Members, the true nature of the Waterproof Mascara Products, including that it contains and/or has a material risk of containing PFAS.

174.    As a direct and proximate cause of Defendant's conduct, Plaintiff and Class members suffered actual damages as alleged above.

175.    Plaintiff also seeks injunctive relief for Defendant to refrain from the continued advertising of Waterproof Mascara Products that omits and misrepresents material facts, including that the Waterproof Mascara Products contain and/or have a material risk of containing PFAS. Plaintiff further seeks injunctive relief forcing Defendant to replace all Waterproof Mascara Products for Class Members.

## SECOND CAUSE OF ACTION

**Breach of Express Warranty**
**(On Behalf of Plaintiff and the Nationwide Class**
**or, in the Alternative, the New Jersey Subclass)**

176.    Plaintiff incorporates by reference all preceding allegations contained in this Complaint.

177.    In connection with its sale of Waterproof Mascara Products, by and through statements in labels, packaging, and ingredient lists, and other written materials intended for consumers and the general public, Defendant made certain express affirmations of fact and/or promises relating to its Waterproof Mascara Products to Plaintiff and the Class, as alleged herein, including that such Waterproof Mascara Products were safe to use on eyes and fit to be used for

their intended purpose. These express affirmations of fact and/or promises include ingredient lists and labels that purport to attest to the safety of the Products but fail to include that the Waterproof Mascara Products contained and/or had a material risk of containing PFAS.

178.    Defendant advertised, labeled, marketed, and promoted the Waterproof Mascara Products with such express affirmations of fact and/or promises in such a way as to induce Plaintiff and Class Members to purchase and use the Waterproof Mascara Products, thereby making an express warranty that the Waterproof Mascara Products would conform to the representations of being safe.

179.    Defendant's affirmations of fact and/or promises about the Waterproof Mascara Products, as set forth herein, constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain.

180.    Despite the express warranties Defendant created with respect to the Waterproof Mascara Products, Defendant delivered Waterproof Mascara Products to Plaintiff and the Class that did not conform to Defendant's express warranties in that such Waterproof Mascara Products were defective, dangerous, and unfit for use, did not contain labels adequately representing the nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendant breached the express warranties by representing through its labeling, advertising, and marketing materials that its Waterproof Mascara Products were safe, and intentionally withheld information about the contents containing detectable levels of PFAS and the risks associated with use of the carcinogenic Products on the eyes.

181.    Plaintiff and Class members relied on Defendant's express promises and representations that the Waterproof Mascara Products were safe to use on eyes and fit to be used

for their intended purpose as contained on the labels, packaging, and ingredient lists.

182.    Defendant had sole access to material facts concerning the contents of its Waterproof Mascara Products and the nature of the risks associated with the use of the Products, as Defendant expressly stated on their labels the safety of the Products, and knew that consumers and purchasers, such as Plaintiff and Class members, could not have reasonably discovered that the statements expressly included in Waterproof Mascara Products' labels were inadequate and inaccurate.

183.    Plaintiff and each member of the Class have had sufficient direct dealings with Defendant or its agents (including distributors, dealers, and authorized sellers) to establish privity of contract between Defendant and Plaintiff and each member of the Class.

184.    As a direct and proximate result of Defendant's breaches of express warranties, as alleged herein, Plaintiff and the Class sustained economic loss in an amount to be proven at trial. The Waterproof Mascara Products contained and/or had a material risk of containing dangerous PFAS, which will require Plaintiff and Class Members to incur costs to prematurely replace the product and costs to discontinue use of the product before its expiration.

185.    As a result of Defendant's breaches of express warranties, as alleged herein, Plaintiff and the Class seek an order awarding compensatory damages and any other just and proper relief available under the law.

## THIRD CAUSE OF ACTION

### Breach of Implied Warranty
### (On Behalf of Plaintiff and the Nationwide Class
### or, in the Alternative, the New Jersey Subclass)

186.    Plaintiff incorporates by reference all preceding allegations contained in this Complaint.

187.     At all relevant times, Defendant was a merchant of Waterproof Mascara Products that were sold to Plaintiff and Class members and was in the business of marketing, promoting, and selling such Products to the consuming public. Defendant designed, developed, and sold the Waterproof Mascara Products knowing that Plaintiff and Class members would use them.

188.     Each Waterproof Mascara Product sold by Defendant comes with an implied warranty that it will be merchantable and fit for the ordinary purpose for which it would be used. Defendant expected the consuming public, including Plaintiff and Class members, to use the Waterproof Mascara Products and such use was reasonably foreseeable. And Plaintiff and Class members expected the Waterproof Mascara Products to be useable and to perform in a manner consistent with their packaging and labeling.

189.     Defendant breached its implied warranty of merchantability because its Waterproof Mascara Products were not in merchantable condition when sold because they contain or have a material risk of containing dangerous PFAS.

190.     Defendant's Waterproof Mascara Products are not fit for the ordinary purpose for which they were sold because they contain or have a material risk of containing dangerous PFAS.

191.     Defendant did not properly disclaim the warranty of merchantability and fitness for a particular purpose.

192.     Plaintiff and Class members were injured as a direct and proximate result of Defendant's breaches of implied warranties of merchantability. Plaintiff and members of the Class were damaged as a result of Defendant's breaches of implied warranties of merchantability because, had they been aware of the unmerchantable condition of the Waterproof Mascara Products, they would not have purchased such Products.

193.     As a result of Defendant's breaches of implied warranties of merchantability, as

alleged herein, Plaintiff and the Class seek an order awarding compensatory damages and any other just and proper relief available under the law.

### FOURTH CAUSE OF ACTION

**Unjust Enrichment**
**(On Behalf of Plaintiff and the Nationwide Class**
**or, in the Alternative, the New Jersey Subclass)**

194.    Plaintiff incorporates by reference all preceding allegations contained in this Complaint.

195.    As the intended and expected result of its conscious wrongdoing alleged herein, Defendant has profited and benefited from Plaintiff's and Class members' purchases of the Waterproof Mascara Products.  Plaintiff's and Class members' payments for the Waterproof Mascara Products flowed to Defendant.

196.    Defendant voluntarily accepted and retained these profits and benefits derived from Plaintiff and the Class, with full knowledge and awareness that, as a result of its misconduct, Plaintiff and the Class were not receiving products of the quality, nature, fitness, or value that had been represented by Defendant and that Plaintiff and the Class, as reasonable consumers, expected for a product applied to the eye.

197.    If Plaintiff and Class members knew the Defendant's Waterproof Mascara Products were not safe and contained PFAS as alleged herein, they would not have purchased Defendant's Waterproof Mascara Products.

198.    Defendant has been unjustly enriched by its fraudulent and deceptive withholding of benefits to its customers at the expense of Plaintiff and the Class.

199.    Defendant profited from Plaintiff's purchases and used Plaintiff and Class members' monetary payments for business purposes. Defendant's retention of these profits and

benefits is inequitable and against good conscience. Principles of equity and good conscience preclude Defendant from retaining these profits and benefits.

200.    As a direct and proximate result of Defendant's unjust enrichment, Plaintiff and the Class suffered injury and seek the disgorgement and restitution of Defendant's wrongful profits, revenue, and benefits, plus interest, to the extent and in the amount deemed appropriate by the Court, and such other relief as the Court deems just and proper to remedy Defendant's unjust enrichment.

## FIFTH CAUSE OF ACTION

### Violation of New Jersey Consumer Fraud Act,
### N.J. STAT. ANN. § 56:8-1, Et Seq.
(On Behalf of Plaintiff and the New Jersey Subclass)

201.    Plaintiff incorporates by reference all preceding allegations contained in this Complaint.

202.    Plaintiff brings this claim on behalf of herself and the New Jersey Subclass against Defendant.

203.    Defendant and the New Jersey Subclass members are "persons" within the meaning of the New Jersey Consumer Fraud Act ("New Jersey CFA"), N.J. STAT. ANN. § 56:8-1(d).  The Defendant engaged in "sales" of "merchandise" within the meaning of N.J. STAT. ANN. § 56:8-1(c) and (d).

204.    The New Jersey CFA makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged

thereby[.]"  N.J. STAT. ANN. § 56:8-2.

205.    Defendant's Waterproof Mascara Products contains and/or has a material risk of containing PFAS-a fact it omitted to disclose-and Defendant misrepresented that its Products were safe for use on eyes. Defendant knew or should have known that its Waterproof Mascara Products should not contain PFAS and that by manufacturing and providing for commercial sale Waterproof Mascara Products containing and/or having a material risk of containing PFAS, Plaintiff and Class members were not getting safe products to use on a sensitive part of the face, the eye.

206.    Plaintiff and Class members would not have purchased the Waterproof Mascara Products at issue had they known the truth about the presence of PFAS. There is no other use for Defendant's tainted Waterproof Mascara Products.

207.    Defendant violated the New Jersey CFA by designing, manufacturing, and selling Waterproof Mascara Products containing and/or having a material risk of containing PFAS and by failing to properly represent, both by affirmative conduct and by omission, the actual contents of its Waterproof Mascara Products.

208.    If Defendant had not sold Waterproof Mascara Products containing and/or having a material risk of containing PFAS, Plaintiff and Class members would not have suffered the extent of damages caused by Defendant's sales.

209.    Defendant's practices, acts, policies, and course of conduct violate the New Jersey CFA in that, among others things, Defendant actively and knowingly misrepresented or omitted disclosure of material information to Plaintiff and Class members at the time they purchased the Waterproof Mascara Products, including the fact that Defendant's Products contained PFAS, and that Defendant failed to disclose and give timely warnings or notices regarding the presence of PFAS in its Products that were purchased by Plaintiff and Class members.

210.    The conduct alleged herein constitutes an unconscionable business practice in that Defendant has, by the use of false statements and/or material omissions, failed to properly represent and/or concealed the presence of detectable levels of PFAS in its Waterproof Mascara Products.

211.    Members of the public, including Plaintiff and Class members, were deceived by and relied upon Defendant's affirmative misrepresentations and failures to disclose.

212.    Such acts and practices by Defendant are and were likely to mislead a reasonable consumer purchasing Waterproof Mascara Products. Said acts and practices are material. The sales of Defendant's Waterproof Mascara Products in New Jersey, through such means occurring in New Jersey, were consumer-oriented acts and thereby fall under the New Jersey CFA.

213.    To this day, Defendant continues to engage in unlawful practices in violation of the New Jersey CFA.  Defendant continues to conceal the defective and harmful nature of the Waterproof Mascara Products and has failed to disclose, on inquiry from Plaintiff and Class Members, the true nature of the Waterproof Mascara Products, including that they contain and/or has a material risk of containing PFAS.

214.    Plaintiff and the New Jersey Subclass members suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information.

215.    In addition to or in lieu of actual damages, because of the injury, Plaintiff and the Class members seek statutory and treble damages for each injury and violation which has occurred.

216.    Plaintiff also seeks injunctive relief for Defendant to refrain from the continued advertising of Waterproof Mascara Products that omits material facts, including that the Waterproof Mascara Products contain and/or have a material risk of containing PFAS. Plaintiff

further seeks injunctive relief forcing Defendant to replace all Waterproof Mascara Products for Class Members with a non-toxic mascara.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment against Defendant and in favor of Plaintiff, and award the following relief:

a) Certification of the Class with Plaintiff appointed as class representative and the undersigned appointed as Class Counsel;

b) Find that Defendant engaged in the unlawful conduct as alleged herein and enjoin Defendant from engaging in such conduct;

c) Enter a monetary judgment in favor of Plaintiff and the Class to compensate them for the injuries suffered, together with pre-judgment and post-judgment interest, punitive damages, and penalties where appropriate;

d) Injunctive relief requiring Defendant to replace all Waterproof Mascara Products owned by the Class, and enjoining Defendant from continuing to mislabel Waterproof Mascara Products and require Defendant to disclose the true nature of the Waterproof Mascara Products, including that they contain and/or have a material risk of containing PFAS;

e) A declaration that Defendant must disgorge, for the benefit of the Class, all or part of its ill-gotten profits received from the sale of the Waterproof Mascara Products;

f) An award of all actual, general, special, incidental, statutory, treble, or other multiple, punitive and consequential damages under statutory and common law as alleged in this Complaint, in an amount to be determined at trial;

g) Award Plaintiff and the Class reasonable attorneys' fees and costs of suit, as allowed by law; and

h) Award such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: April 8, 2022

Respectfully submitted,

SEEGER WEISS LLP

By: s/ *Christopher A. Seeger*
Christopher A. Seeger

Christopher A. Seeger
Jeffrey S. Grand
Christopher L. Ayers
SEEGER WEISS LLP
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Tel.: 973-639-9100
Fax: 973-679-8656
cseeger@seegerweiss.com
jgrand@seegerweiss.com
cayers@seegerweiss.com

*Attorneys for Plaintiff and the Proposed Class*